,P. FREEMAN v. R. J. CATES.

Decided February 3, 1900.

**1.  Business Homestead—Abandonment—Change of Business.**

That defendant abandoned carrying on a mercantile business in a building he owned, situated on a lot directly adjoining his residence lot, did not subject the lot with such building on it to execution where defendant, upon abandoning the mercantile business, engaged in keeping a boarding-house, and used some of the rooms in such building in connection therewith, though others of the rooms were rented out.

**2.  Same—Charge.**

In such case a charge that if defendant abandoned his business in the storehouse building, then it and the lot became subject to execution, was properly refused, since the inquiry was not whether he abandoned that business, but whether he abandoned the property as a place for conducting his business.

**3.  Same—Abandonment Complete, When.**

Where the homestead, or a part of it, is abandoned as homestead, it ceases to be homestead property and becomes subject to execution, whether or not the owner definitely intends to put the property to other and different uses.

APPEAL from Ellis. Tried below before Hon. J. E. DILLARD.

*Singleton & Bisland,* for appellant.

*J. C. Smith,* for appellee.

FINLEY, CHIEF JUSTICE.—This is a suit of trespass to try title to lots 3, 4, and 5, block 5, in the town of Bristol, Ellis County, Texas. Freeman obtained a money judgment against Cates, caused execution to be issued and levied upon these lots, and they were sold under the execution, and bought in by Freeman for $10, which was credited upon the judgment. Freeman sues for the lots, relying upon his title under the execution sale, and, under the plea of not guilty, Cates seeks to defeat a recovery upon the ground that the property was his homestead, and not subject to execution.

The undisputed evidence shows that in 1893 Cates owned lots 1, 2, 6,

and 7, of said block 5, and that the same was then and has continued to be his residence homestead, occupied as such by himself and family. On lots 1 and 2 was situated his residence house; on lot 7 was his well and barn; on lot 6 was his garden. Lots 1, 2, 3, 4, and 5 are 40 by 100 feet. Lots 6 and 7 are 100 by 100, feet. He was engaged in merchandising, conducting his business in a rented house situated upon lots 3 and 4 in said block. In 1895 he bought lots 3, 4, and 5, and continued to use the house on lots 3 and 4 for his mercantile business. He put up a fence, the north line of which extended along the north lines of lots 1 and 7. The east line along the east lines of 7 and 6. The south line extended along the south line of lot 6 and part of the south line of lot 5. Then the fence ran north through the lot 5 and into lot 4 to a point opposite the storehouse. There the fence turned west and run to a connection with the south wall of the store at the southeast corner. A fence was also run from the northwest corner of the store so as to inclose lots 3, 2, and 1 on the west. The fence was run without reference to the lines which separated the lots. The following plat will show the situation of the lots and aid in the explanation of the uses to which they were put:

It is agreed that all of block 5, including lots 1, 2, 3, 4, 5, 6, and 7, has been continuously used by Cates for homestead purposes, unless it be those parts of lots 3 and 4 covered by the storehouse, and that the real issue is, whether the storehouse and land covered by it is exempt from execution as homestead. "X" designates the residence house and "Y" the storehouse. The mercantile business was conducted in the front room of the house, designated on the plat "A." In 1896 Cates failed in business. The back room to house, designated on the plat "B," was built by Cates in 1897. Rooms "C" and "D" are shedrooms. Cates has been running a boarding-house, taking in both transient and regulars boarders continuously since he moved on this property in 1893. Room "D" was used to sleep boarders, in connection with his dwelling-house, and has been used for no other purpose. Cates himself has frequently slept in room "B," and sent others there to sleep when he was crowded for room at his dwelling house. It was generally used as a bedroom by tenants of room "A," who boarded with Cates. Rooms "A" and "C" have been regularly rented out since his failure in business in 1896, the former for mercantile business and the latter for barber shop. As shown by the plat, parts of lots 3, 4, and 5 are inclosed with the garden place. The north line of lot 3 comes within five or six feet of the dwelling-house. Cates has engaged in no regular business since his failure other than keeping a boarding-house, for which he paid no occupation tax. In 1898 he raised a small crop on rented land near the little town in which he lived, bought a wagon and team, and hauled some wood for sale, and did any odd jobs of work which he could get to do. He testified that the renting of portions of the house was intended to be temporary, and that he did not intend to abandon it as his homestead. The levy of execution upon lots 3, 4, and 5 and the sale thereunder occurred in 1898. The town of Bristol is a small, unincorporated village, and, though laid off and platted into blocks and lots, very little attention is paid to lot or block lines.

The trial resulted in a verdict and judgment in favor of the defendant, and plaintiff has appealed.

*Opinion.*—1. It is first insisted that the evidence showed that the homestead character which once attached to the storehouse and the land upon which it is situated had been lost by the abandonment of it as a place of business, and that it was therefore subject to execution. The verdict of the jury decided this issue contrary to this contention, and unless the evidence is conclusive that the storehouse and land on which it was located was abandoned as homestead, we should not hold the verdict unwarranted by the evidence. The manner in which the fence was made to inclose this property in connection with that already owned and devoted to residence homestead purposes, the placing of parts of lots 3, 4, and 5 in the garden lot, and the use of shed rooms attached to the storehouse as bedrooms, tended to show that the original purchase of these

lots was intended as an addition to the residence homestead, and that they were put to uses in keeping with such purpose. This phase of the question seems not to have been insisted on in the trial court, and is not urged here, and for this reason we will not discuss it or treat it as necessarily important. The question of homestead vel non was made to rest upon the issue whether the storehouse had been abandoned as a place of business at the date of the levy, and such is the pivotal question presented by the briefs of counsel here. Appellant insists that the fact that room "A" was rented for mercantile purposes and room "C" for a barber ship from the time of appellee's failure in business to the time of the levy and since, and that the other rooms were used as bedrooms, shows an abandonment of the house for business uses. Under the case of Pfeiffer v. McNatt, 74 Texas, 640, the length of time the property was rented, 1896 to 1898, before the levy, should be treated as showing that such renting was not temporary within the meaning of the Constitution, had the property been put to no other uses. In determining the question of abandonment of the business homestead, the right of a man to change the character of his business must not be excluded from view. Because he once conducted a mercantile business in his house, he is not required to continue that character of business in the house in order to preserve the homestead characteristics in the property. If he has failed in business and rented the property, his intention to resume the use of it as a place of business, making the renting temporary, should not be confined to the inquiry whether it was his purpose to again take up the mercantile business in the house. The evidence fairly shows that the business upon which Oates relied, after his failure in merchandising in 1896, was keeping a boarding-house. His residence house, in part, and two of the rooms of the storehouse, were put into contributory service to this business. If he had taken the entire building for this purpose, devoting all the room it contained for sleeping apartments for his boarders, it would hardly be said that, because his residence was in part used for the same purpose, he had ceased to use the building as a place of business, and that it should for this reason be treated as abandoned. If a part of the building, in connection with his residence, was sufficient to meet his demand for bedrooms for his boarders, would the renting of the surplus rooms in the building forfeit the homestead character of the rented part of the building and the land underneath it? It would seem that the same principle would be involved in the inquiry, whether the renting of unnecessary rooms in a residence homestead building would destroy the constitutional exemption of the rented part of the residence and the land upon which it rested? It is hardly necessary to say that this would not be an abandonment. In Shryock v. Latimer, 57 Texas, 677, it is said, "the head of a family must have a calling or business to which the property is adapted and reasonably necessary." We take it that this language means that a mere pretense of conducting a business in a house will not preserve the homestead character; but there must be an actual bona fide business, and the place where the business is conducted

must be of such a nature as to respond to the requirements of such a business. It is not meant, certainly, that the building shall be adapted to the business in the sense of exact appropriateness and nicety of its appointments. In the case at bar, the facts are not fully developed as to the character of the building. We are not informed of the material of which the house is built, the dimensions of the rooms, their full and exact relation to each other, and are left largely to inference on the question of the adaptability of the building to uses of a boarding-house. Under this state of the evidence we are unwilling to say that abandonment was conclusively proven.

2. Appellant asked a special charge, in effect, that if Cates abandoned his *business* in the storehouse, then the store building and the land on which it stood became subject to execution. The charge was properly refused. The inquiry was not whether he abandoned the business conducted in the house, but whether he abandoned the property as a place for conducting his business. This charge, had it been given, might have misled the jury. There is no question that he abandoned the mercantile business which he once carried on there, but there is an issue as to whether he continued to use the property as a place of business.

3. The charge of the court is complained of in this particular: The court charged the jury that "the husband or the head of the family may abandon a part of the property used as a homestead, but in such case he must intend to permanently use the portion abandoned, for other and different purposes than that of homestead purposes." This charge was error. If the homestead, or part of it, be abandoned as homestead, it ceases to be homestead property and becomes subject to execution, without regard to any definite intention on the part of the owner to put the property to other and different uses. The abandonment may occur without any defined purpose to put the property to other uses, but it would be no less an abandonment for this reason.

4. The only remaining assignment of error complains of that portion of the charge of the court which instructed a verdict for plaintiff, if the defendant had abandoned his business in the storehouse and was not using the storehouse, in connection with his dwelling, for the purposes of carrying on a boarding-house business, as being upon the weight of evidence. The contention is that the court assumed that the defendant was engaged in the boarding-house business. The charge is not fairly subject to this objection. The judgment is reversed and the cause remanded.

*Reversed and remanded.*